FRANK L. BURNETT v. ROBERT G. HOPWOOD AND OTHERS.[1]

August 12, 1932.

No. 28,915.

[1]Reported in 244 N. W. 254.

*Melrin, Brown & Sherman,* for appellant.
*Stinchfield, Mackall, Crounse, McNally & Moore,* for respondents.

WILSON, C. J.

Plaintiff appealed from an order denying his motion for a new trial.

Plaintiff and defendant Hopwood became partners under an oral agreement in a stock and bond brokerage business in 1919. In 1922 defendant Davenport joined the firm, which continued under an oral agreement. On May 15, 1927, the three partners entered into a written partnership contract.

When Davenport became a partner he paid $20,000, and Burnett and Hopwood, "having by mutual agreement of said [three] partners taken, each, the sum of $1,500 for their personal accounts, from the $20,000 then contributed and paid by said defendant Davenport for his interest in said partnership." It was understood by the three partners that plaintiff and defendant Hopwood each sold to him a 1/16 interest in the business and that the remaining $17,000 only was to be and was set up as capital contributed by Davenport. He later increased his contributions to capital.

From time to time the parties made such contributions to the capital of said firm that on and since May 31, 1925, the total contributions of each of said partners to the capital of said firm were as follows: "R. G. Hopwood, $100,000.00; F. L. Burnett, $100,000.00; D. Davenport, $25,700.00."

The books of the firm have since shown such capital investment. From May 15, 1927, to May 15, 1929, each partner was monthly credited with interest at the rate of six per cent on his respective contributions to capital.

The acquisition cost and the actual market value of the memberships owned by the firm as of May 15, 1929, were respectively as follows:

|  | "Acquisition Cost | Value as of May 15, 1929. |
|---|---|---|
| New York Stock Exchange | $92,000.00 | $419,000.00 |
| New York Stock Exchange Rights |  | 104,500.00 |
| Minneapolis Chamber of Comm. | 9,000.00 | 5,000.00 |
| Minneapolis Clearing House | 2,800.00 | 2,670.00 |
| Chicago Board of Trade | 8,300.00 | 38,900.00 |
| New York Curb | 250.00 |  |
|  | $112,350.00 | $570,070.00" |

On the basis of the contributions made by each of the partners, according to the figures above indicated and as entered upon the partnership books, plaintiff had a 44.3 per cent interest in the co-partnership. But the parties supposed that the ratio was 7/16, 7/16, and 2/16, respectively; and net profits were divided upon that basis. This was with the knowledge and consent of each of the three partners, who then thought it was mathematically accurate. After making the contract on May 15, 1927, the parties continued so to divide their profits on the same basis, and the court found that all the partners recognized and accepted as a fact that the partners had contributed to capital in the proportion of 7/16 by plaintiff, 7/16 by Hopwood, and 2/16 by Davenport, though that was not in fact the actual proportion in which capital had been contributed, the difference being about .55 per cent. The discrepancy was not discovered until after the present controversy arose.

Paragraph 6 and a portion of paragraph 7 of said written partnership contract provides the following:

"6. After the payment of the expenses and charges, the net profits of said business shall be divided among the said partners according to the proportion hereinafter specified, and the losses shall be borne in the same proportion; that said profits shall be divided between them in such shares and proportions as they have contributed to the capital of said co-partnership.

"7. In the event of the death or withdrawal of one or more of said partners from said partnership, the estate or partners with-

10

drawing from said firm shall be paid an amount by the remaining partners, provided one or more remain in business, which amount shall be arrived at as follows:

"(a) The cost price of all memberships owned on the day of the death or withdrawal of said partner shall be added to the market price of said memberships on said day, or if there be no sales as of that day, then the last sale prior to said date of death or withdrawal. This sum after any expenses of transfer shall have been deducted shall be divided by two (2) and the deceased or withdrawing partner's proportion of this amount shall be paid as his interest in said partnership may appear on the books of said partnership as of the day of his death or withdrawal. This amount shall be paid by the remaining partners within thirty (30) days after the death or withdrawal of said partner or partners, together with such other amounts as may be due him upon the books of said company on that day, which amounts shall be accepted as payment in full for all right, title and interest said deceased partner may have in said partnership."

In obedience to the partnership contract, plaintiff, desiring to withdraw from said firm, gave notice of his withdrawal therefrom effective May 15, 1929.

A controversy arose as to the construction of paragraph 7 of the firm contract. Defendants then tendered the plaintiff as and for his interest in the copartnership the sum of $215,500. Plaintiff, claiming more, refused to accept this amount. At the time of making such tender defendants delivered to plaintiff a statement, exhibit L, showing the basis for such tender. It is as follows:

"Statement of Amount Due
Frank L. Burnett
On Withdrawal From Partnership
of Hopwood & Burnett
May 15, 1929.

Share of memberships assets, as determined by contract ................................................... $149,253.13

| | |
|---|---:|
| Share of cash capital assets, including furniture & equipment | 49,590.62 |
| Share of profit & loss, year 1929, 4½ months: May being determined on basis ½ revenue and ½ expense as agreed* | 16,215.45 |
| | $215,059.20 |
| *Includes share of suspense account of bad debts to be collected or adjusted. | |
| June 10th, balance personal account | 276.28 |
| | $215,335.48" |

The testimony is that the tender of $215,500, instead of $215,335.48, was intended to be enough to stop interest. This action followed. After the commencement of the action defendants paid plaintiff $164,287.52 to apply on what he had coming, but without prejudice to either party in this action.

The original cost price of all memberships owned by the partnership on May 15, 1929, was $112,350. The market price of these memberships on said day was $570,070. The sum of said cost price and said market price as of May 15, 1929, was $682,420. This sum divided by two is the sum of $341,210. Seven-sixteenths of this last mentioned amount is $149,279.37. This computation is based upon paragraph 7 of said contract, and the court found that the plaintiff was entitled to receive from the defendants the last mentioned amount and that he was not entitled to any part of any balance of the capital of said partnership.

On May 15, 1929, the books of the partnership showed undivided profits in the sum of $36,229.51, and the court awarded plaintiff his fractional portion thereof of $15,850.40. In addition thereto the court found and awarded plaintiff $389.09, due from the firm to plaintiff on his personal account on May 15, 1929, and the further sum of $56.59. The court also found that subsequent to May 15, 1929, but prior to June 14, 1929, defendants paid out at the request of plaintiff $1,836.33, leaving a net amount due from plaintiff

to defendants in the sum of $1,390.65; that plaintiff was also indebted to defendants in the sum of $250 for a minor membership which he retained. The net result was an award to plaintiff of $163,489.12. There were other net assets of $113,350 which necessarily stood in the capital account in which the court gave plaintiff no share.

■ Under the language of the written partnership contract and the books of the partnership, plaintiff was entitled to a 44.3 per cent interest in the copartnership profits and assets; but from the conduct of the parties disclosed by the evidence and partially mentioned in the statement of facts, the court was justified in finding that the parties by acquiescence and conduct had modified their respective rights so as to commit themselves to the proposition that the plaintiff and Hopwood were entitled to a 7/16 interest each and defendant Davenport to a 2/16 interest.

■ The meaning of the first two sentences in subdivision (a) of paragraph 7 is clear, and the parties agreed as to the operation thereof: The acquisition cost of memberships, $112,350, plus $570,070, the market value on May 15, 1929, totals to $682,420, which when divided by two gives a result of $341,210. Seven-sixteenths of this last amount is $149,279.37. The plaintiff now protests against the court's finding that this $149,279.37 pays him in full for his interest in the partnership.

The disagreement comes as to the meaning of the language used in the last sentence in paragraph 7, and in particular as to the words therein: "together with such other amounts as may be due him upon the books of said company on that day."

The word "other" as so used necessarily means "in addition to." What then are the additional amounts which were "due him upon the books of said company on that day?" This does not refer to the item of undivided profits of $36,229.51, of which the court allowed plaintiff $15,850.40, for the simple reason that paragraph 6 contains a specific provision for plaintiff to have his share thereof.

Respondents say that this provision as to amounts "due him upon the books" refers only to interest claims on capital, salary

account, trading account, or such other sums as the copartnership might then owe a partner as a general creditor. This construction would mean that this refers solely to what plaintiff had coming as a general creditor and not because of his ownership of an interest in the partnership which he was selling. It would seem, however, as stated by plaintiff in his brief, that this clause would not ordinarily refer to such items, because plaintiff's relation to the firm in respect thereto would be that of a general creditor; and if it were the intention of the parties to pay him only the balance due him as such creditor, there would have been no occasion for including the clause which specifies "which amounts shall be accepted as payment in full for all right, title, and interest said deceased partner may have had in said partnership." Indeed, all creditors must be paid anyway. It seems plain that whatever plaintiff was to receive was to be received in payment of his interest in the firm.

The real question is as to whether plaintiff's contribution to capital is, upon dissolution of the partnership, a "debt due" plaintiff.

Upon the dissolution of a copartnership the members are entitled to get back what they have contributed to capital if it is unimpaired and all the obligations of the copartnership have been paid. Under such circumstances a member has something coming to him. In such a situation the amount to be received by the partner from such source would undoubtedly be a "debt due" to him.

Under our uniform partnership act, capital, upon the dissolution of the partnership, unless otherwise agreed, is a debt of the partnership. G. S. 1923 (2 Mason, 1927) §§ 7412, 7421, 7423. There is nothing in the partnership agreement before us inconsistent with the spirit and language of the statute classifying capital as a debt of the copartnership. Indeed this partnership contract was made in the light of the existing statutory provisions above mentioned and the applicable rules of the common law, and such provisions are presumed to be a part of the contract; and it should be understood that, unless the agreement otherwise provided, the parties must have acted on the theory that capital is a debt of the partnership in favor of the partners.

14

The rule of law to the effect that capital is a debt of the partnership does not rest alone upon the provisions of the uniform partnership act. It is a rule of the common law. The authorities generally recognize that the capital contributed to a partnership is upon dissolution a "debt due" the partners.

A partner's contribution to capital is to be repaid to him in full if the firm assets are sufficient after paying the firm's liabilities to outsiders; and, if insufficient, then the ratable proportion is to be repaid to him. It is therefore a debt which is due to him from the firm. 1 Rowley, Modern Law on Partnership, § 275, pp. 305-308; 47 C. J. p. 1172, § 861; Buie v. Kennedy, 164 N. C. 290, 80 S. E. 445; Adams v. Hubbard, 221 Pa. 511, 70 A. 835; In re Hall, 32 R. I. 424, 79 A. 966; Chapin's Estate v. Long, 205 Mo. App. 414, 224 S. W. 1012; Whitcomb v. Converse, 119 Mass. 38, 20 Am. R. 311; Neudecker v. Kohlberg, 3 Daly (N. Y.) 407; Bradbury v. Smith, 21 Me. 117; Rowland v. Miller, 7 Phila. (Pa.) 362; Castrucci v. Roumegous, 31 Ont. W. N. 160 (appeal dismissed, 32 Ont. W. N. 73).

■ Paragraph 7 is not ambiguous. Oral testimony is therefore inadmissible to show what the parties meant by the language used. The rule is that where the wording of the contract is unambiguous, as here, the intention of the parties must be deduced from the language used and not from extraneous testimony.

Where language in a contract is capable of different constructions, a construction favorable to justice and which will not lead to the perpetration of a great wrong or absurd results should be adopted. C. St. P. & K. C. Ry. Co. v. St. Paul U. D. Co. 54 Minn. 411, 56 N. W. 129; Williams v. National Contracting Co. 160 Minn. 293, 199 N. W. 919; McCrea v. First Nat. Bank, 162 Minn. 455, 203 N. W. 220; 2 Dunnell, Minn. Dig. (2 ed. & Supp.) § 1824; A. E. Little Co. v. John W. Thomas & Co. Inc. 174 Minn. 87, 218 N. W. 242; Pressed S. C. Co. v. Eastern Ry. Co. (C. C. A.) 121 F. 609; Terrell v. Alexandria Auto Co. 12 La. App. 625, 125 So. 757; Jessar Realty Corp. v. Louis Friedman Realty Co. Inc. 227 App. Div. 733, 236 N. Y. S. 565; Citizens Bank v. Frazier, 157 Miss. 298, 127 So. 716; Love v. Couch, 181 Ark. 994, 28 S. W. (2d) 1067; Luten Bridge

Co. v. Grant County, 206 Ky. 528, 267 S. W. 1082; MacDonald v. Aetna Ind. Co. 90 Conn. 226, 96 A. 926; W. J. Foye Lbr. Co. v. Penn. R. Co. (C. C. A.) 10 F. (2d) 437; Bayne v. U. S. (C. C. A.) 195 F. 236; Ohio Crane Co. v. Hicks, 110 Ohio St. 168, 143 N. E. 388; Llewellyn v. Board of Education, 324 Ill. 254, 154 N. E. 889; Clark v. State St. Tr. Co. 270 Mass. 140, 169 N. E. 897. If the contract is susceptible of two constructions, that interpretation which evolves the more usual, reasonable, and probable contract should be adopted.

There is no serious contention but that the net assets of this copartnership on May 15, 1929, were of a reasonable value of $719,649.51. In the absence of any such provision as paragraph 7 in the copartnership agreement, plaintiff, upon a dissolution of the partnership, under the law, would have been entitled to receive 7/16 of the above amount, or $314,846.63, less $1,390.65, or $313,455.98. But the parties saw fit to make a contract as indicated.

What are the probabilities of plaintiff's intending to make the contract if construed as now claimed by defendants? He knew the value of the memberships. His 7/16 interest therein amounted to $249,405.62. Under the arbitrary revaluation as specified in the contract, he is given but $149,279.37 therefor. In addition to his interest in the memberships, he had a substantial interest, which is here involved, in the remaining assets. It is bordering on an absurdity for us to construe this contract so as to take all of plaintiff's interest in the firm for the net result of the arbitrary revaluation of the lone item of memberships.

The partnership agreement heavily penalizes a withdrawing partner. The record is not satisfactory as to why this should have been done. One of the defendant partners claims that it was in the interest of the copartnership, while another defendant partner claims that it was in the interest of the retiring partner and his family. Obviously the arbitrary method for revaluing the memberships results in a substantial sacrifice on the part of the retiring member. In addition thereto, defendants now seek to exclude plain-

tiff entirely from the $113,350 remaining in the capital account. On the other hand, plaintiff cannot justify his present claim, which he presents in this form:

"Evaluation of Memberships, Paragraph 7 of Contract.

| | | |
|---|---|---|
| Acquisition cost | $112,350.00 | |
| Market value at time of withdrawal | 570,070.00 | |
| | $682,420.00 | |
| One-half of this amount | $341,210.00 | |
| 44.3% of above amount | | $151,156.03 |
| 44.3% of capital | | 100,000.00 |
| 44.3% of undivided profits ($36,229.51) | | 16,049.67 |
| Difference between 44.3% and 7/16ths of profits distributed | | 568.55 |

Less

| | | |
|---|---|---|
| Amount paid July 19, 1929, by order of court | $164,287.52 | |
| Amount owing firm on personal account (excluding item of $250 for New York Curb Exchange Membership) | 1,390.65 | |
| Balance due | 102,096.08 | |
| | $267,774.25 | $267,774.25" |

In conformity with our views hereinbefore expressed, plaintiff must accept 7/16 instead of 44.3 per cent as his interest in the remaining assets if he is given any part thereof. The foundation for his further claim of $102,096.08 is his demand for the return of the full amount of his contribution to capital, which was $100,000.

Plaintiff's method of computing the amount of his claim is unsound. He asks for the return to him of his full contribution to capital in the sum of $100,000. Under the authorities cited, a partner can only recover his proportion of the capital remaining after all obligations are paid. In this case the parties by paragraph 7 of the partnership agreement set aside $112,350 of the capital ac-

count and appropriated it to the arbitrary method of a revaluation. They thereby made a special distribution of a specific item in the capital account. The capital and capital account of the firm was diminished to this extent in harmony with the partnership ratio. Having taken this item out at cost, it was no longer in the capital account. This arbitrary special computation in the way of a revaluation of this item had the effect of diminishing the capital account to the same extent that it diminished the partnership assets as carried on the books. The result was that the capital account was thereby reduced from $225,700 to $113,350. Plaintiff seems to have overlooked this fact. But unless plaintiff has lost his rights, by virtue of the partnership contract, he is entitled to 7/16 of $113,350, which is $49,590.62. The amount "due him upon the books" in relation to his contribution to capital is his ratio of the unused capital.

We are unable to understand why the parties should ever have intended that plaintiff should have relinquished his interest in the item last mentioned. To so hold would be unjust and perhaps absurd. This is not a case where the parties were dealing with doubtful values. In fact the value of all the assets is satisfactorily established. It must be remembered that in the absence of the arbitrary provision and the contractual obligations contained in the partnership agreement, plaintiff's interest, or distributive share in case of the dissolution of this copartnership, was $314,846.63. The court awarded him $165,129.77. If he is now given 7/16 of the $113,350, which is $49,590.62, he will receive $214,720.39, which is $100,126.24 less than he would have received in the absence of any contract controlling the distribution. It is difficult to see why plaintiff intended to surrender more or how his partners could expect him to do so. Defendants' tender to plaintiff of $215,500 is a strong circumstance tending to show that they at that time construed the contract substantially as we do. We are of the opinion that our construction of the contract favors justice and avoids an absurd result. Defendants' auditors, whose report is in evidence, first computed the revaluation of the membership under the arbi-

trary method and found plaintiff's share to be $149,279.37, with which all agree. They then report net working assets remaining to be $152,450.51; and 7/16 of this amount is $66,697.28, which added to the $149,279.37, plus $389.09, gives a total of $216,365.74, as plaintiff's distributive share of the assets. This apparently included capital and undivided profits. It is to be noted that the three items of exhibit L are in harmony with the figures of defendants' auditors and are consistent with our conclusion.

In ascertaining the intent of the parties as evidenced by the language used, it is proper for us to consider the reasonable construction of the language, as reflecting upon a probable and honest transaction and its bearing upon the question as to whether reasonable men would have intended the results of one construction in preference to the results from another construction. Courts must give to a contract that construction or interpretation, if possible, which will square its terms with fairness and reasonableness, rather than to apply a construction which will result in an unjust loss to a party to the contract.

We are of the opinion that the language of the contract requires a construction that the interest of a retiring partner in the unimpaired capital is a "debt due" him upon the books of the firm. But upon the theory that this language is capable of different constructions, the rule that invokes a construction favorable to justice and which will not lead to the perpetration of a great wrong or absurd results leads to the same conclusion. Such rule must be observed as far as reasonably possible. It follows that plaintiff, in addition to what has been awarded him, must be given the further sum of $49,590.62, which is 7/16 of the $113,350, with interest; the tender not having been kept good.

Reversed.

HOLT, J. (dissenting).

I dissent. The agreement respecting the amount to be paid a withdrawing partner for his interest in the firm was made after the business had been conducted for several years. It was a business of considerable risks, for in 1929 the outstanding accounts and

liabilities each exceeded $3,000,000. The continuing partners were liable to sustain a loss not only in realizing on the accounts, but in the greatly fluctuating values of the memberships in the stock exchanges—the chief assets of the firm. These matters no doubt dictated the terms of the withdrawal agreement. And in my opinion the trial court correctly construed it to mean that the withdrawing member relinquished all his interest in the firm to the continuing partners upon his being paid his proportionate share of a sum arrived at by adding the cost of the memberships in the stock exchanges to the market value of such memberships on the withdrawal date and divide by two. This amount is to be paid the withdrawing member within 30 days from the withdrawal date, "together with such other amounts as may be due him upon the books of said company on that day." It seems to me the quoted sentence cannot refer to paid in capital, for a very large part thereof was invested in the stock exchange memberships. It must mean the amounts due him on his individual account.

STONE, J. (dissenting).

I think there should be an affirmance for the reason stated by Mr. Justice Holt.