RESERVE MINING COMPANY, a Minnesota corporation, Plaintiff,

v.

MESABI IRON COMPANY, a Delaware corporation, Arnold Hoffman, Arthur G. Logan, Malcolm S. MacKay, Gilbert M. Haas, Lanfear B. Norrie, Quincy Adams Shaw, Jr., and Odin A. Sundness, Defendants.

No. 5-58 Civ. 109.

United States District Court
D. Minnesota,
Fifth Division.

March 30, 1959.

**2**

Dancer, Montague, Applequist, Lyons, Nolan & Nordine, by J. E. Montague, Duluth, Minn., Jones, Day, Cockley &

Reavis, by Walter J. Milde, Wm. K. Jones and George H. Rudolph, Cleveland, Ohio, for plaintiff.

Palmer, Hood, Crassweller & McCarthy, by Ray G. Palmer, Duluth, Minn., Gallop, Climenko & Gould, by Jesse Climenko and Herbert L. Scharf, New York City, for defendants.

DONOVAN, District Judge.

This action, commenced in the state court of Minnesota and removed to federal court, seeks construction of Minnesota contracts and multiple relief in connection therewith. Jurisdiction is based on diversity of citizenship and it is axiomatic that in such a case the United States District Judge is just another Minnesota court in applying the law of the forum and in anticipating Minnesota law in absence of decided cases. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188; Textron, Inc. v. Homes Beautiful, 8 Cir., 261 F.2d 646, 651; Woodhull v. Minot Clinic, 8 Cir., 259 F.2d 676, 678; Rosen v. Westinghouse Electric Supply Company, 8 Cir., 261 F.2d 514, 515, 516; New York Life Insurance Company v. Dick, 8 Cir., 252 F.2d 43, 44.

Plaintiff, Reserve Mining Company, a Minnesota corporation, and defendant Mesabi Iron Company, a Delaware corporation, are the principal parties (all other defendants are nominal) and will hereafter be referred to as Reserve and Mesabi, respectively. If mention need be made of the individual defendants (who are described as officers and directors of Mesabi) they will be referred to by their surnames.

The following facts appear from the pleadings, exhibits attached thereto, motions[1] and supporting affidavits. The

---

1. At oral argument in Duluth, Minnesota, on *October 3, 1958, the relief sought by the parties was based on the pleadings and motions as follows:*

   1. Motion by Reserve for a temporary injunction.

   2. Motion by Mesabi to dissolve the restraining order issued by the state court and dismiss the motion by Reserve for a temporary injunction.

   3. Reserve's petition and motion for the *court's order directing Mesabi to proceed with arbitration as provided by contract.*

   4. Mesabi's motion for partial summary judgment as to Reserve's prayer for relief in the complaint having to do with the construction of the contracts by declaratory judgment with reference to (a) arbitration; (b) notice of default;

predecessors in title of the present fee owners of certain lands in St. Louis County, Minnesota, leased said lands on October 1, 1917, to one Claude W. Peters for the purpose of mining and treating low grade iron ore known as taconite. Said lease, as amended and supplemented, will hereinafter be referred to as the Peters Lease. By transfer in due course, Mesabi became the owner of the lessee's interest under the Peters Lease.

By instrument dated July 25, 1939, Mesabi assigned the Peters Lease to Reserve, and simultaneously executed a lease (hereinafter referred to as the Mesabi Lease) by which auxiliary lands were leased to Reserve.[2] The consideration to Mesabi included Reserve's promise to pay Mesabi one-third of the net profits realized by Reserve from its operations carried on under the Peters Lease.

Anticipating questions that might arise and cause dispute among the parties, Article Fifteenth of the Mesabi Lease (Exhibit "AA", pp. 15, 16 of the answer) provided for arbitration as follows:

"D. C. Jackling, as representative of the Lessor, and Gilbert R. Johnson, as representative of the Lessee, are hereby constituted a permanent Board of Arbitration. Either party from time to time hereafter, upon Ten (10) days' written notice to the other party, may substitute any person in lieu of its representative. Said Board shall have power, upon the written concurrence of both of its members, to determine every question which may arise under this lease or under said assignment of the Peters Lease * * *. If they fail

to agree they shall name a disinterested third party, and the question in dispute shall be submitted to the three, and a decision of a majority thereof shall be final and binding upon both parties; but if they fail, or be unable to agree upon any such third person, then he shall be appointed by a Judge of the District Court of the Eleventh Judicial District in and for the County of St. Louis, State of Minnesota."

Reserve's business consists of mining and selling iron ore, ore concentrates and beneficiated ore, and in that connection it caused to be constructed its own industrial railroad from its dock and harbor on the North Shore of Lake Superior for a distance of forty-seven miles north to its mines, mill and plant at Babbitt, Minnesota. Necessarily considerable capital was needed, obtained and went into the project fathered by the lease agreements.[3] Reserve has been in continuous possession since 1939, of all property transferred to it under the lease agreements and which, together with said lands described therein and the mines, dock, harbor, power plant and accessories, will hereinafter, as one unit, be referred to as the plant.

Said plant went into full production in the year 1955. The product was mined, milled and treated, and finally shipped via Reserve's railroad to its dock and harbor and from there by lake vessels to lower lake ports. This having been attained, the accounting and report by Reserve to Mesabi followed. Reserve made a report of its operations of the plant up to and including the year 1957, and thereupon disputes occurred between Re-

(c) re-entry; (d) actions in other courts; (e) injunctions against defendants; all as set forth in paragraphs 1 and 3 of Reserve's prayer for relief.

  5. Motion by Mesabi to amend its answer so as to plead counterclaims and bring additional parties into the present case.

  6. Motion by Reserve to strike the third defense (having to do with equity's requirements), the fourth defense (having to do with monopolies), and the twelfth

defense (having to do with alleged abuses of arbitration).

2. The Peters Lease and Mesabi Lease are made a part of the pleadings by reference and sometimes referred to collectively as the "lease agreements."

3. Reserve in its verified complaint alleges an expenditure of $178,000,000. Mesabi, admitting such possibility, alleges 80% of such moneys were acquired through financing rather than cash disbursements.

serve and Mesabi, having to do with questions arising under the assignment of the Peters Lease. Said questions were certified for arbitration pursuant to the quoted arbitration clause, supra.[4]

Arbitration had been resorted to by Mesabi as early as 1955. Its sharing in Reserve's profits appears to be limited to Reserve's "operations carried on under said Peters Lease." The controlling contracts deny to Reserve interest on its investment as a cost only in the case of the capital costs of "the construction of a new milling or processing plant or any enlargement or extension thereof or for the enlargement or extension of any plant now under the Peters Lease." [5]

It is understandable why (in such a vast mutual enterprise), in the attempts of Reserve and Mesabi to carry out the intent of the parties to the controlling contracts, disagreements would arise in connection with investment, operation and profit. One of the problems posed has to do with the construction and operation of the dock and harbor on the North Shore of Lake Superior and the forty-seven-mile industrial railroad between the dock on the North Shore of Lake Superior and the mine and mill at Babbitt, Minnesota. Hence, on March 22, 1957, Mesabi again invoked the aid of said arbitration clause, submitting five questions for determination by the arbitrators.[6]

Within a few days thereafter, certain stockholders of Mesabi filed a derivative stockholders' action in a Delaware Chancery Court [Putterman v. Daveler, 134 A.2d 480] wherein Mesabi, its Board of Directors and Reserve were named defendants. Service on Reserve (a Minnesota corporation) was attempted under the Delaware sequestration statute, 10 Del.C. § 366. The case was removed to the United States District Court for the District of Delaware at the instance of Reserve and remanded by the latter court on motion of said stockholders and Mesabi. The Delaware action (commenced prior to the instant case) sought recovery on behalf of Mesabi against Reserve for net profits and cancellation of contractual relations.[7]

Mesabi's annual meeting was held on or about April 18, 1958, and reorganization followed. Thereupon new counsel were appointed and substituted in the place of Chadbourne, Parke, Whiteside and Wolff. A letter dated May 14, 1958, was addressed by the newly substituted counsel to the neutral arbitrator, Wesley A. Sturges (copy to William K. Montague, Reserve's designated arbitrator) advising of changes effected.[8] This was followed by a letter dated June 16, 1958,

---

4. Reserve, by complaint and argument, pleads for resumption of arbitration previously undertaken and discontinued. Mesabi, in its verified answer, pleads (and argues orally and by brief) the arbitration clause "is not valid, is unenforceable * * * and is revocable by either party at any time prior to * * * award thereunder."

5. The quotation is from the contract of leasing.

6. See Exhibits A to E inclusive, attached to and made a part of the complaint herein.

7. Putterman v. Daveler, D.C., 169 F.Supp. 125. Plaintiffs succeeded in sequestering Mesabi stock owned by Reserve.

8. The letter reads as follows:
   "Dear Dean Sturges:
   "We have a copy of a letter dated May 12, 1958, addressed to you by Charles Pickett, Esq. We confirm the information imparted to you by Mr. Pickett that this firm has been designated as general counsel to Mesabi Iron Company, and that we are to take over the handling of the pending arbitration. We advise you further that Mr. Klugescheid withdrew as the Arbitrator designated by Mesabi on April 21. We anticipate that within the next ten days we will be in a position to communicate with you and the other interested parties to advise as to the designation of a substitute for Mr. Klugescheid and to arrange for resumption of the hearings.
   "We sincerely trust that the events of the last few weeks have not seriously inconvenienced you, and we assure you and all others concerned that our client and we will make every effort to expedite the resumption of proceedings.
   "Very truly yours,
   "Gallop, Climenko & Gould"

over the signature of Mesabi's new president, advising of intent to abandon arbitration and "assume the plaintiff's position in the pending Delaware litigation." [9]

The correspondence explanatory of the steps leading to the parties' resort to said Article Fifteenth of the Mesabi Lease are made a part of Reserve's complaint by reference to attached Exhibits A to G inclusive. The questions certified to on October 30, 1957, by the Board of Arbitration are set forth in Exhibit F of Reserve's complaint and read as follows:

"The undersigned, presently constituting the Board of Arbitration under Article Fifteenth of the Lease between Mesabi Iron Company and Reserve Mining Company, dated July 25, 1939, hereby state that they have failed to agree on the determination of the following questions in dispute which have been submitted to said Board of Arbitration:

"The following questions submitted by the letter of Mesabi Iron Company to Reserve Mining Company dated March 22, 1957:

"1. Are you entitled to make a 'Transportation charge', in respect of your railroad operations, which exceeds the expenses actually incurred in operating the railroad?

"2. Are you entitled to make a 'Charge for power produced' by you, which exceeds the expenses actually incurred in operating the power plant facilities?

"3. Are you entitled to make a 'Charge for loading ore for shipment', in respect of your dock and harbor operations, which exceeds the expenses actually incurred in operating the dock and harbor facilities?

"The following questions submitted by the letter of Reserve Mining Company to Mesabi Iron Company dated April 16, 1957:

"A. With respect to our railroad line, equipment and operations, our electric power plant, facilities and operations and our dock and harbor facilities and operations, is the principle of using a tariff charge for each of these items, as in our Reports and Statements to you, proper?

"B. If the use of a tariff charge for any item referred to in Question A should be determined improper, shall the charge with respect to such item include a reasonable rate of return on investment, gross or net, and, if so, what is such a reasonable rate of return on either of such bases?

"C. If, with respect to any of the items referred to in Question A, it should be determined that it is improper to use a tariff charge or to include a reasonable rate of return on investment, does such facility constitute a 'new milling or processing plant or plants or any enlarge-

9. The letter reads in part as follows:
"We have now received counsel's report and analysis of the arbitration proceedings with Reserve. After carefully reviewing this study, together with all pertinent files and data available, including voluminous arbitration transcriptions and exhibits, as well as fully considering Reserve's attitude as revealed in the recent discussions, your directors have concluded that in order to compel Reserve to make a strict accounting to Mesabi in accordance with its contractual obligations and obtain a ruling as to possible breaches of contract on their part, the most effective course of action is to present our case in a court of law. Accordingly, Mesabi has taken steps to assume the plaintiff's position in the pending Delaware litigation which was instituted more than a year ago by certain stockholders seeking relief for our company.

*    *    *    *    *

"P. S. As the foregoing was prepared for transmittal, word reached your management that Reserve has instituted an action in Minnesota apparently intended to force Mesabi back into the arbitration proceedings. At this time our only comment is that, as you can see from the body of this Interim Report, your management has already taken steps to have its differences with Reserve resolved in a court of law as opposed to arbitration. Reserve's latest action makes it abundantly clear that the best interests of Mesabi require recourse to the courts."

ment or extension thereof or * * the enlargement or extension of any plant now [July 25, 1939] on the lands covered by said Peters Lease or on lands leased' by you to us, as to which 'the cost and repayment of' financing the same, 'including the interest payable thereon, shall be borne solely' by us; if not, what are the proper charges to be included for the cost of financing the same by borrowed money and by capital obtained by equity financing?

"D. Does every facility acquired or constructed by us constitute 'a new milling or processing plant or plants or any enlargement or extension thereof or * * * the enlargement or extension of any plant now [July 25, 1939] on the lands covered by said Peters Lease or on lands leased' by you to us as to which 'the cost and repayment of' financing the same, 'including the interest payable thereon, shall be borne solely' by us, with the result, as suggested by you, 'that all interest and finance costs should be eliminated under the provisions of the Contract'?

"E. Have we assigned, as suggested by you, 'incorrect prices' to the product of our operations under said Peters Lease and said Lease; if so, what are the correct prices?

"The following questions submitted by the letter of Mesabi Iron Company to Reserve Mining Company dated April 26, 1957:

"6. If your question A is answered in the affirmative, in whole or in part, and you should be held entitled to make a charge exceeding and to the exclusion of the expenses actually incurred in the operations of the railroad, the power plant facilities, or the dock and harbor facilities:

"(a) What is the proper charge for such operations?

"7. If your questions A and B are answered in the negative, in whole or in part, in determining the expenses deductible in respect of the railroad, the power plant facilities, or the dock and harbor facilities:

"(a) Are you entitled to treat as a deductible expense any interest or finance expense in respect thereof?

"(b) If question 7(a) is answered in the affirmative, what is the proper deduction therefor?

"8. Are your deductions of interest and finance expense (some of which have been included in your reports as 'Interest and Finance Expense' but others of which have been included in other items listed in your reports) proper? For example, were deductions properly made of interest and finance expense allocated by you to:

"(c) The townsite properties?

"(d) The mining lands and facilities?

"Accordingly these questions in dispute shall be submitted to a Board of Arbitration consisting of three arbitrators under said Article Fifteenth.

"/s/ Richard C. Klugescheid
"Richard C. Klugescheid,
Arbitrator
"/s/ William K. Montague
"William K. Montague,
Arbitrator
"Dated October 30, 1957."

Said Exhibits A to G inclusive, together with Exhibits AA and BB, exemplify the wisdom exercised by the parties in providing for arbitration with reference to disputed questions, such as those above set forth. The questions are pertinent to the principal issues herein and followed obvious disagreement (arising from time to time and as disclosed in correspondence) by the operating officials of Reserve and Mesabi, and resulting failure to mutually understand the intent and purpose of the parties to said controlling instruments.

The lease agreements are instruments dealing with Minnesota property, delivered by Mesabi's escrow agent to Reserve in Duluth for signature, and to be

performed in Minnesota. They are pleaded in full in Mesabi's answer, by reference to said Exhibits AA and BB attached thereto, and "with respect to the terms of paragraph 'Fifteenth' " for the purpose of determining "the intentions of the parties." [10]

Reserve and Mesabi have a common interest in the success of the project in the sense that the " 'net profits' * * * shall be deemed to be the income * * received from the sale of ore, ore concentrates, metalized ore, or other minerals and materials of every kind and nature and the by-products thereof mined and shipped from the lands covered by said Peters Lease * * * minus all ordinary and necessary current expenses of [Reserve] * * * such as mining, quarrying, transportation, beneficiation, general, overhead, royalties, commissions, management, taxes, insurance and losses from bad debts, as well as any other expenses incurred through the production, beneficiation, sale and shipment of ore, ore concentrates, minerals and materials * * *, and shall also include fair and reasonable amounts covering depreciation and obsolescense of capital expenditures * * *, in addition thereto, * * * in connection with operations [by Reserve], * * * under other lands leased from Mesabi, or any or all of them." [11] "Net profits" would obviously increase or decrease, dependent upon production and marketability of the product. To that end customers and potential investors engaged in the manufacture of steel were contacted with a view to interesting them in the project. Some were owners of Reserve stock.[12]

The processes developed and in use by Reserve for making pellets from taconite or low grade iron ore are available to the public and industry. There is nothing in the record to indicate the process is patentable. Iron extracted from taconite and reduced to pellets for use in the manufacture of steel has long been known to the mining industry.

The United States District Court, District of Minnesota, Fifth Division, convened in St. Louis County, Minnesota, may well take judicial cognizance of the early endeavor anticipating the mutual accomplishment realized in more recent times by Mesabi and Reserve. Some of the first steps in this facet of the iron ore industry were taken under the auspices of D. C. Jackling, former president of Mesabi. The diligence and persistence of Jackling and his early associates in the management of Mesabi is a saga of discovery, development and progress in the lean ore industry on the Iron Range of Minnesota. The Peters Lease furnished in abundance the raw product which was locked in the fastness of a metamorphic series of rock commonly known today as taconite. The Jackling men acquired the taconite but lacked the method and means to separate the iron content from the granite-like rock that held it captive. In the early 1920's the Jacklings of that day visualized the realism of today and built a plant at Babbitt, where the iron was rescued from the taconite by what was termed a sintering process. Its future was sufficiently promising to induce The Duluth and Iron Range Railroad Company to extend its track from the railroad mainline to Babbitt. The product was shipped to the dock at Two Harbors, Minnesota. But the men of Jackling were thirty-five years ahead of that day. The project failed. The branch track and plant followed the path of material things which moths consume and rust destroys. The taconite and genius of man were all that remained of the initial project. Through the intervening years, Mesabi continued its interest in possibilities that might lead to the production of marketable iron from taconite. As a

10. See paragraph 7 of defendant Mesabi's answer, and Exhibits A to F inclusive, attached to Reserve's complaint.

See also New York Life Insurance Company v. Dick, supra.

11. Mesabi's answer, Exhibit BB, page 6.

12. National Steel Corporation, Cleveland-Cliffs Iron Company, Montreal Mining Company and various other corporations. Republic Steel Corporation showed interest and was encouraged to participate by Mesabi's president on January 25, 1950.

result, an improved process, plus progressive management, furnished the impetus and means needed for the project's resuscitation and fruition of Mesabi's renewed efforts.

The mining industry had to be convinced that the pelletized iron could be produced, marketed and shipped at a profit, and in that respect the foundation for the new project was undertaken in an able and convincing manner. Reserve was organized and took over the capitalizing and operating by virtue of the lease agreements. Reserve and Mesabi, thus cooperating, could obtain the necessary capital and the desired market. Jackling, his associates and Mesabi's stockholders were aware of the capabilities of Reserve and Mesabi engaged in a common enterprise. If an assured market was the equivalent of an open but doubtful market, why not accept the assured? [13]

Republic Steel Corporation and Armco Steel Corporation agreed with Reserve in September, 1953, to take all of Reserve's production of pellets, and in reliance thereon certain insurance companies loaned $140,000,000 to Reserve, secured by mortgage-indenture and issuance of bonds. It is this arrangement that Mesabi contends amounts to a violation of the Sherman and Clayton Acts of Congress.[14]

Without capital to establish the project and a market for the pelletized product of taconite, Mesabi was in a dead-end avenue of taconite mining. Mesabi was aware of this. As early as April 12, 1938, Jackling (then president of Mesabi) wrote to Raymond Hindle (then vice president and treasurer of Mesabi) about how the idea of two or more consumers of Mesabi's product (pellets) was "in accord in principle with my [Jackling's] thought as to how the Mesabi iron situation might be turned over to others who in time could develop ways and means of commercializing the iron ore deposits in question." [15] It will thus be observed that what later transpired was contemplated by Mesabi long prior to the mining and auxiliary accomplishments and the "net profits" arising therefrom.

By pleadings, motions and supporting affidavits Reserve contends that the sale of pellets to Republic and Armco is legal, and arbitration enforceable. Mesabi contends that said Article Fifteenth is invalid and unenforceable, and that the closing of the market to all of the industry except Republic and Armco reduces the "net profits" division to which Mesabi is entitled, in violation of the lease agreements, because pellets are a product superior to "Old Range Non-Bessemer ores", and for that reason bring a higher market price.[16]

The foregoing will suffice, for present purposes, as a statement of the case, facts and contentions involved herein.

The diligence of counsel has been productive of informative oral arguments and briefs. The lease agreements (re-

13. To illustrate, by letter dated January 25, 1950, Jackling (then president of Mesabi) wrote Harvey S. Mudd (then a director of Mesabi) as follows:

"As you are aware, the Republic Steel people have been negotiating with Reserve for some time with the view of acquiring an interest, presumably that controlled by Oglebay-Norton, in the sublease covered by the Mesabi-Reserve agreement. As you also know, Don Gillies, Vice-President of Republic, has had some informal conversations with Mr. Daveler as to whether or not the Mesabi directors would be favorably disposed to Republic becoming financially interested in the Reserve lease. * * * I told him (Gillies) very candidly that I and I was certain all others of Mesabi officials would be glad to see Republic interested in the Mesabi-Reserve situation."
And on October 4, 1950, president Jackling wrote Mesabi's stockholders (commenting on publicity given Republic and Armco's interest in Reserve), saying:
"This change in ownership of Reserve has not in any way affected the terms of the original lease of the Mesabi properties to Reserve as approved by your company's stockholders in June, 1939 * * *."

14. 15 U.S.C.A. §§ 1, 2, 15 and 18.

15. See affidavit of Eben H. Cockley.

16. See affidavits of Odin Sundness, Thomas L. Joseph and Harold Cope.

lied on by counsel), as one would expect, are a clear exposition of the intent and purpose of two participating corporations highly specialized in the mining industry. The words and phraseology used by the parties to the lease agreements are peculiarly adapted to and in common use in such agreements. To illustrate, we quote from the Mesabi Lease as follows:

"[The premises are] leased * * for the purpose of exploring for, mining, removing, treating, shipping and selling the iron ore, taconite * * * and any other minerals or materials * * * concentrating and agglomerating * * *.

"Lessee shall pay no royalty to the Lessor, [other than] * * * the percentage of the net profits * * * derived from Lessee's operation * * *. All expenses incurred by the Lessee under this lease shall be included in the costs of the Lessee used in computing the net profits of Lessee from its operations under the Peters Lease and in which net profits the Lessor participates pursuant to said assignment of the Peters Lease. Such costs under both this lease and the Peters Lease shall cover all ordinary and necessary current expenses of Lessee such as mining, quarrying, transportation, beneficiation, * * * as well as any other expenses * * * through the production * * * sale and shipment of ore, ore concentrates * * * and materials of every kind and nature and the by-products thereof * * *. The expenses shall also include fair and reasonable amounts covering depreciation and obsolescence of capital expenditures for improvements, buildings, machinery and equipment, and * * * amortization of accu-

mulated carrying charges * * *", etc.

Article Fifteenth, supra, follows.

The intellect and skill of corporation lawyers retained by Reserve and Mesabi are reflected in their quoted handiwork. The marvel of the claimed dispute between the contracting parties is how a misunderstanding ever came about.

The two principal issues in the case at bar are these:

1. Is arbitration, as contemplated by said Article Fifteenth, valid and enforceable?

2. Is there a basis in law and fact for the issuance of an injunction against defendants, as prayed for by Reserve?

Reserve argues that the arbitration clause is enforceable under federal law [17], state law [18], and common law [19].

Mesabi argues that the arbitration clause is invalid and unenforceable.

■ As said above, the lease agreements and the rights and liabilities of the signatories thereto must be construed in the light of Minnesota law, except where commerce under the Federal Arbitration Act may be involved. At the outset, it should be observed that the federal, state and common law approach to the problem favors arbitration.[20]

If the Federal Arbitration Act is applicable, Article Fifteenth is valid, irrevocable and enforceable. If it is inapplicable, and the state statute applies in this diversity case, then it must be considered "substantive." [21] Study of the lease agreements does not literally evidence "a transaction involving commerce" to such an extent as to invoke application of the federal statute and it cannot be applied unless Mesabi drafts it into the case by its claims of violation of the

17. 9 U.S.C.A. §§ 1 to 5, inclusive.

18. 37 Minnesota Statutes Annotated, §§ 572.08 to 572.30, inclusive, as amended.

19. Zelle v. Chicago & N. W. R. Co., 242 Minn. 439, 65 N.W.2d 583; Park Const. Co. v. Independent School Dist. No. 32, 209 Minn. 182, 296 N.W. 475, 135 A.L.R. 59.

20. Zelle v. Chicago & N. W. R. Co., supra. The similarity of the federal and state statutes emphasizes and makes clear that arbitration is looked upon with favor.

21. Bernhardt v. Polygraphic Co., 350 U.S. 198, 200, 76 S.Ct. 273, 100 L.Ed. 199.

Sherman [22] and Clayton [23] Acts of Congress. The lease agreements alone, however, portray nothing in restraint of trade. The correspondence between the parties or their officers, as disclosed in the file herein, indicates a bi-lateral tendency to channel the sale of the pellet product of the lease agreements to Republic and Armco. If so, the hands (clean or soiled) of Reserve and Mesabi are equally involved.[24] As now viewed by the Court, neither monopoly nor restraint of trade are relevant at this time, but the Court's ruling thereon will be held in abeyance until necessity therefor and in order to protect Mesabi's claims in connection therewith. In any event, the suggested involvement of the Sherman and Clayton Acts, supra, is no bar to the application of the law of the forum. Express remedies provided by said Acts cannot be added to judicially by including avoidance of private contracts as a sanction. The suggested amendment to Mesabi's answer to include the accusation of monopoly and restraint of trade is a form of collateral attack directed against Reserve's cause of action, which is based on contract.

In the recent case of Kelly v. Kosuga, 79 S.Ct. 429, 431, the Court said:

"Obviously, state law governs in general the rights and duties * * * [of parties to a contract depressing the futures price and cash market price of the goods sold], and, while the effect of illegality under a federal statute is a matter of federal law, Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 176–177, 63 S.Ct. 172, 173–174, 87 L.Ed. 165, even in diversity actions in the federal courts after Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817,

82 L.Ed. 1188, still the federal courts should not be quick to create a policy of nonenforcement of contracts beyond that which is clearly the requirement of the Sherman Act.

\* \* \* \* \* \*

" * * * in any event, where, as here, a lawful sale for a fair consideration constitutes an intelligible economic transaction in itself, we do not think it inappropriate or violative of the intent of the parties to give it effect even though it furnished the occasion for a restrictive agreement of the sort here in question."

■ Whether the difficulties encountered as disclosed by the file in the present case are due to good faith misunderstanding or "unclean hands," it is apparent that the hands of Reserve and Mesabi are in pari delicto in that respect. The Court is impressed from study of the file that the parties have all along dealt at arm's length and with hands upon the table. While the Court is persuaded that the books abound with knowledge as to the meaning of "net profits", it need only be said here that the term has long been in use and is unambiguous, and hence should be construed in its plain, ordinary and familiar sense.

■ The lease agreements in suit are Minnesota contracts and this Court must follow the law of the forum as it finds it, or predict what it will be if no Minnesota case in point is found.[25] It is sound Minnesota law that where language used in a written agreement is plain and unambiguous, there is no room for construction.[26]

Mesabi emphasizes failure of the lease agreements to make arbitration a condi-

---

22. 15 U.S.C.A. §§ 1–3.

23. 15 U.S.C.A. §§ 15–18.

24. This does not amount to unreasonable restraint of trade or a violation of the "rule of reason." See: Adams Dairy Company v. St. Louis Dairy Company, 8 Cir., 260 F.2d 46, 53; Pittsburgh Plate Glass Co. v. Paine & Nixon Co., 182 Minn. 159, 234 N.W. 453.

25. See also: Textron, Inc. v. Homes Beautiful, supra.

26. See: State v. Lake Mining Company, 243 Minn. 205, 67 N.W.2d 669; Burnett v. Hopwood, 187 Minn. 7, 14, 244 N.W. 254, 257; Wallace v. Joseph Dixon Crucible Co., 223 Minn. 162, 165, 25 N.W.2d 465, 466, 467; Nelson v. Republic Iron & Steel Co., 8 Cir., 240 F. 285.

tion precedent to litigation. Under the dual statutory requirements, this is of no avail, and if federal and state arbitration statutes are not controlling, resort must then be had to Minnesota common law,[27] holding the arbitration clause valid, irrevocable and enforceable. Prior to enactment of the Uniform Arbitration Act by the Minnesota legislature, the state policy favoring arbitration was unequivocally and clearly enunciated by the State Supreme Court in a case holding an agreement to arbitrate "all differences" valid.[28] In a subsequent decision (although stating the case before it was not an action for specific performance), the Court affirmed a trial court order "declaring the arbitration provisions of the agreement valid and enforceable and further ordering that the parties forthwith proceed to take such action as is required to carry plaintiffs' demand for arbitration through to completion." [29]

Resort to arbitration removes the controversy from the litigating tribunal without effect on the jurisdiction of the Court. True, one can gather from the contents of the file a possible basis for Mesabi's complaint of procrastination, and if such causes unreasonable delay, it should be discontinued.

■ The Court declares said arbitration clause valid and enforceable.

Does the file of the instant case justify the issuance of a permanent injunction, prayed for by plaintiff?

Reserve urges that a permanent injunction be granted against further Delaware proceedings. Enjoining Mesabi would be tantamount to restraining the state court.[30] State courts, as a matter of comity, ordinarily refrain from interference with the processes of each other, but as between federal and state courts, it is another matter.

■ It is well settled law [31] that when a federal court first acquires jurisdiction of the subject matter of a cause, it may enjoin the parties from proceeding in a state court of concurrent jurisdiction, where the effect of the litigation would be to defeat or impair the jurisdiction of the court first acquiring control of the action. The converse of this is also true under appropriate circumstances. Where the jurisdiction of the state court has first attached (as in the situation in the Delaware action, supra), the federal court is then precluded from exercising its jurisdiction over the same subject matter. The rule is essential to the orderly administration of justice and to prevent unseemly conflicts between courts of concurrent jurisdiction over the same subject matter and persons.[32] Each court has plenary power, and there is no presumption that one will decide a controversy better or more justly than the other.

■ The power of the federal courts to enjoin a state court has been limited by statutory regulation as far back as 1793.[33] The Court is not persuaded that any of the three exceptions apply to the instant case. No Act of Congress expressly authorizes such relief; no other

27. Either by reason of inapplicability of statutes, or the effect of Erie R. Co. v. Tompkins, supra, as suggested by Bernhardt v. Polygraphic Co., supra.

28. Park Const. Co. v. Independent School Dist. No. 32, supra, and cases cited therein.

29. Zelle v. Chicago & N. W. R. Co., supra, [242 Minn. 439, 65 N.W.2d 588], where, as here, there was no mention of irrevocability in the arbitration provision quoted, nor any requirement that arbitration be a condition precedent to litigation.

30. Oklahoma Packing Co. v. Oklahoma Gas & Electric Co., 308 U.S. 530, 309 U.S. 4, 9, 60 S.Ct. 215, 84 L.Ed. 537.

31. Kline v. Burke Const. Co., 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226; Lion Bonding & Surety Co. v. Karatz, 262 U.S. 77, 43 S.Ct. 480, 67 L.Ed. 871.

32. Merritt v. American Steel-Barge Co., 8 Cir., 79 F. 228, 231.

33. 28 U.S.C.A. § 2283, which provides:
"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."
The predecessor of this prohibition provided:

exclusive jurisdiction is involved justifying the continuation of the injunctive aid ordered by the state court; nor is there apparent any present necessity for an injunction to protect or effectuate a judgment of this Court.

Reserve's prayer for a permanent injunction must be denied.

Based upon the file and the arguments and briefs of counsel,

It is ordered that a mandatory injunction issue requiring that, pursuant to the arbitration clause, Reserve and Mesabi proceed with the arbitration of

(a) all questions now before the arbitrators;

(b) all questions which have arisen under the assignment of the Peters Lease or Mesabi Lease as to which Reserve and Mesabi have demanded or may demand arbitration; and

(c) all questions which hereafter arise under the assignment of the Peters Lease or Mesabi Lease as to which Reserve and Mesabi may demand arbitration; and,

all regardless of any proceedings taken in any court by Mesabi or any officer, director or representative of Mesabi or any stockholder purporting to act for Mesabi, or in its right or on its behalf.

It is further ordered that the permanent injunction prayed for by Reserve in paragraph 3 of its prayer for relief be, and the same is hereby denied.

It is further ordered that Mesabi's motion to dissolve the restraining order of the state court is granted.

It is further ordered that Mesabi's motion for partial summary judgment is denied.

It is further ordered that Reserve's motion to strike is denied.

It is further ordered that Mesabi's motion to amend its answer be held in abeyance.

Exceptions are allowed.

"* * * nor shall a writ of injunction be granted to stay proceedings in any court of a state." 1 Stat. 335.

As suggested in Amalgamated Clothing Workers of America v. Richman Bros.,

348 U.S. 511, at page 516, 75 S.Ct. 452, at page 455, 99 L.Ed. 600:

"Legislative policy is here expressed [§ 2283] in a clear-cut prohibition qualified only by specifically defined exceptions."